**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**PATRICIA SIMMONS**                                                              **PLAINTIFF**

**v.**                                                    **CIVIL ACTION NO.:** 1:26cv155 HSO-BWR

**MISSISSIPPI DEPARTMENT OF MARINE RESOURCES**                **DEFENDANT**

**COMPLAINT**
**JURY TRIAL DEMANDED**

**COMES NOW** the Plaintiff, Patricia Simmons, by and through counsel, The Watson Law Firm, PLLC, brings this action to recover damages of violations of her rights pursuant to the Americans with Disabilities Act of 1990, as amended (ADA), 42 U.S.C. § 12101 *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended, for disability discrimination, failure to make reasonable accommodations, and retaliation against the Defendant, Mississippi Department of Marine Resources.  In support of this cause, the Plaintiff would show unto the Court the following facts to-wit:

## THE PARTIES

1.      Plaintiff, Patricia Simmons, is a female resident of Harrison County, Mississippi.

2.      Defendant, Mississippi Department of Marine Resources, may be served with process by serving Lynn Fitch, Attorney General, 500 High Street, Jackson, Mississippi 39201.

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction pursuant to the Americans with Disabilities Act of 1990, as amended (ADA), 42 U.S.C. § 12101 *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended.

1

4.      This Court also has personal and subject matter jurisdiction over the Defendant and venue is proper in this Court.

5.      Plaintiff timely filed a Charge of Discrimination with the EEOC on January 30, 2025, a true and correct copy of which is attached as Exhibit "A."  The EEOC issued a Notice of Right to Sue on February 23, 2026, a true and correct copy of which is attached as Exhibit "B."  Plaintiff timely files this action within ninety (90) days of receipt of her Notice of Right to Sue.

### STATEMENT OF FACTS

6.      Plaintiff is a 38-year-old female resident of Harrison County, Mississippi.

7.      Plaintiff was hired on March 1, 2024, as a Marine Patrol Dispatcher Level II at the Mississippi Department of Marine Resources (MDMR).

8.      On or around December 4, 2021, Plaintiff was diagnosed with a muscular skeletal disability that limits her mobility.

9.      In April 2024, after being hired by MDMR, Plaintiff requested a reasonable accommodation, i.e., she requested an accessible parking space.

10.     Specifically, she made her request known to Dispatch Supervisor Debbie Griffin and Master Sergeant Jack Ewing.

11.     Initially, MDMR appeared to approve the request, and Plaintiff was told they would provide her with a parking spot close to the Directors' parking spots near the employee entrance.

12.     Only a day later, after this accommodation was granted, however, Ms. Griffin informed Plaintiff that Executive Director Benjamin Joe Spraggins had changed his mind and the previous offer of a parking space close to the Directors' spots was denied.

13.     In June 2024, Plaintiff requested that MDMR reconsider accommodating her related to her disability.

14.     In August 2024, MDMR responded by denying her request for accommodation again, and then MDMR informed Plaintiff that she was being switched to the night shift.

15.     Plaintiff contends this decision constituted retaliation against Plaintiff after she made requests for accommodation related to her disability.

16.     On August 22, 2024, given MDMR's refusal to accommodate or even engage further in the interactive process, Plaintiff was left with no choice but to be constructively discharged.

17.     On January 30, 2025, Plaintiff filed an EEOC Charge of disability discrimination and retaliation against MDMR.

18.     On February 21, 2025, in response to Plaintiff' Charge, MDMR submitted a Position Statement to the EEOC.

19.     MDMR's Position Statement alleges that, "On February 22, 2024, Plaintiff interviewed for the Dispatcher II position with MDMR staff. At the beginning of the interview with MDMR staff, it was explained to Plaintiff that the position is responsible for providing dispatch coverage for up to 24 hours a day, including but not limited to, nights, weekends, holiday and special events. See Exhibit E.2. In addition, it was explained to Plaintiff, that considering the small staff, dispatchers are often called to make necessary adjustments to satisfy the schedule. Id. Plaintiff responded in the affirmative that she would be able to meet the demands required of a Marine Patrol dispatcher. Id. Again, during the interview, it was explained to Plaintiff that the position required flexibility with

3

work schedules, and the ability to work any shift: days, evenings, or nights. Id. Again, Plaintiff responded in the affirmative that she was able to work any shift and handle a rotating schedule. Id. Plaintiff offered that she had worked nights before and had no issues with rotating schedules. Id."

20.     Plaintiff contends this allegation is generally accurate, but it omits significant context about the events that occurred.

21.     Ms. Griffin conveyed this information in a hypothetical sense during Plaintiff' initial interview, yet the practical reality of how things actually worked came into focus as Plaintiff began to work.

22.     For example, although rotating shifts was a hypothetical possibility, none of the dispatchers wanted to do it in an ongoing manner.

23.     Rather, according to Ms. Griffin, the dispatchers were allowed to choose whether they were on day shift (i.e., 6am to 6pm) or night shift (2pm to 2am) according to seniority.

24.     Two dispatchers were allowed to work the day shift and two were allowed to work the night shift.

25.     The order of seniority among the dispatchers was as follows: Sherry Mongollen had primary seniority, followed by Neva Hospy, then Plaintiff, then Jaime Marroy, who was hired after Plaintiff.

26.     Since Ms. Mongollen wanted to work the day shift, and Ms. Hospy wanted to work the night shift, Plaintiff selected the day shift, and Ms. Marroy was left to work the night shift.

27.     Ms. Griffin approved of this arrangement, and this was initially acceptable

to all.

28.    MDMR's Position Statement alleges that, "On August 8, 2024, Plaintiff voluntarily submitted her resignation providing a two-week notice effective from August 8, 2024. Plaintiff' last day of employment was August 22, 2024. See Exhibit H.1."

29.    Plaintiff contends this allegation is false and mischaracterizes the events that occurred.

30.    Plaintiff contends she was constructively discharged from her position when MDMR failed to accommodate her related to her disability.

31.    As explained above, In April 2024, Plaintiff requested a reasonable accommodation, i.e., she requested an accessible parking space.

32.    Specifically, she made her request known to Dispatch Supervisor Debbie Griffin and Master Sergeant Jack Ewing.

33.    Initially, MDMR appeared to approve the request, and Plaintiff was told they would provide her with a parking spot close to the Directors' parking spots near the employee entrance.

34.    Only a day later, after this accommodation was granted, however, Ms. Griffin informed Plaintiff that Executive Director Benjamin Joe Spraggins had changed his mind and the previous offer of a parking space close to the directors' spots was denied.

35.    Plaintiff contends there were at least ten other spaces close to the space she had been initially approved for.

36.    Any of those other ten spaces could have been used to accommodate her request.

37.    Instead, she was denied without any further explanation.

5

38.    In June 2024, Plaintiff requested that MDMR reconsider accommodating her related to her disability.

39.    In essence, Plaintiff was merely asking for a parking space that was close to her office.

40.    Because of her disability, she was unable to walk long distances.

41.    Notably, the standard handicapped parking spaces in the area were blocked off by construction that was going on.

42.    There were at least ten spaces close to the back of the building, any one of which could have been selected as her reserved parking space.

43.    Yet MDMR refused to accommodate her in this way.

44.    In August 2024, MDMR responded by denying her request for accommodation again, and then MDMR informed Plaintiff that she was being switched to the night shift.

45.    Plaintiff contends this decision constituted retaliation against Plaintiff after she made requests for accommodation related to her disability.

46.    Plaintiff' assertion that she was retaliated against after making this request for reconsideration is supported by the following: after she requested that MDMR consider accommodating her, Ms. Griffin warned Plaintiff that if she fought for her rights, MDMR leadership would "make your job harder".

47.    As it turned out, this is exactly what MDMR did.

48.    It is further notable that moving Plaintiff to the night shift caused her even more difficulty given that she was accommodated, for the following reasons: when she arrived for the night shift (prior to 2pm), the parking lot was full, necessitating that she

parked far away from the office.

49.    Moreover, when she got off work (around 2am), she had to again walk a long distance through a dark parking lot.

50.    Thus, moving her to night shift exacerbated the problem for which she had requested the accommodation in the first place.

51.    Plaintiff contends the retaliatory animus was intentional.

52.    Whereas MDMR had previously cited seniority as the basis for allowing dispatchers to choose their shifts, after Plaintiff requested MDMR reconsider allowing her a reasonable accommodation, suddenly Plaintiff' seniority was no longer an adequate reasoning.

53.    At that point, Plaintiff was informed that she was being moved to the night shift while Ms. Marroy was being allowed her first choice, i.e., to move from night shift to day shift, despite the fact that Ms. Marroy had less seniority than Plaintiff.

54.    Notably, Ms. Mongollen's seniority remained intact over Ms. Hospy.

55.    The only employee for whom seniority was bypassed was Plaintiff.

56.    On August 22, 2024, given MDMR's refusal to accommodate or even engage further in the interactive process, Plaintiff was left with no choice but to be constructively discharged.

57.    Had she been appropriately and reasonably accommodated, as she requested, Plaintiff would very likely still be employed at MDMR today.

58.    MDMR's Position Statement alleges that, "Plaintiff charge of discrimination references her disability but fails to specify or identify the disability. EMPLOYER objects to Plaintiff failure to identify her alleged disability. In a good faith effort to address the

allegations, EMPLOYER suspects Plaintiff's is alleging a disability involving her leg/foot. Plaintiff was observed wearing an elevation/lift shoe or boot or otherwise described as a 'shoe balancer / leveler and lift' which may be utilized for uneven legs. Plaintiff was also observed utilized a walking cane at times, however, the walking cane was brought to the dispatch office and left within the office without use for weeks at a time."

59.    Plaintiff contends this allegation is false and disingenuous.

60.    Plaintiff informed MDMR that she had a disability, and she made a request for reasonable accommodation.

61.    As the allegation attests, MDMR was familiar with the general nature of her disability and was familiar with several of her assistive devices.

62.    To the extent that this allegation attempts to minimize its awareness of or the severity of Plaintiff' disability, she contends MDMR is acting in bad faith.

63.    Around late March or early April 2024, Plaintiff provided Ms. Griffin with a medical form signed by Nurse Practitioner Stacie Slagle.

64.    This document indicates that Plaintiff "Is severely limited in her ability to walk due to an arthritic, neurological, or orthopedic condition."

65.    When Plaintiff asked Ms. Griffin if any further medical documentation was needed, Ms. Griffin responded no.

66.    Notably, the cane mentioned in the allegation above was Plaintiff' back-up cane (brown), that she kept at her desk for emergencies.

67.    Plaintiff used her VA-prescribed medical cane (black) on a daily basis to assist her mobility.

68.    Plaintiff adamantly contends that she was fully open and honest about her

disability.

69.     MDMR has no legitimate grounds for alleging that she failed to identify her disability.

70.     MDMR's Position Statement alleges that, "EMPLOYER disputes Plaintiff allegations that she made any request for an accommodation for parking. At all times during Plaintiff's employment, Plaintiff had full access to the ADA compliant handicap parking spaces at the Bolton Building. On a typical 8:00 a.m.-5:00 p.m./Monday through Friday workweek, 1 to 2 of the aforementioned ADA spaces may be utilized at a given time. Plaintiff worked the day shift during her employment. The day shift dispatchers arrive at the Bolton Building approximately 5:30 a.m. to begin a 6:00 a.m. shift. The ADA handicap parking spaces and practically all other parking spaces are available during that time."

71.     Plaintiff contends this allegation is misleading, omits significant context, and is disingenuous.

72.     As already stated, Plaintiff had a highly visible disability.

73.     She wore a shoe lift and regularly used a cane.

74.     Moreover, she fully explained her disability during her initial interview at MDMR.

75.     Around late March or early April 2024, when Plaintiff gave her Mississippi Disabled Parking document to Ms. Griffin, she asked Ms. Griffin if any other medical documentation was needed.

76.     At that point, Ms. Griffin responded no.

77.     If there was any other procedure that should or could have been followed

but was not, it was due to MDMR's failure, not Plaintiff'.

78.     As explained above, the allotted handicapped parking spaces in the employee parking lot (in the back of the building) were blocked off by construction.

79.     For that reason, when she was initially accommodated, she was allowed to park in a parking space close to the Directors' spaces, close to the back of the building.

80.     The next day, however, when, for reasons never clarified, the accommodation was withdrawn, Plaintiff was told that according to Mr. Spraggins she would need to "compete" for handicapped spaces in the customer parking lot, (in the front of the building) which was much further walking distance to her office than the back of the building.

81.     Significantly, it denies logic for MDMR to allege that Plaintiff failed to request accommodation for parking when in fact she was, albeit very briefly, accommodated by MDMR with a parking space close to the building.

82.     Only a day later, however, evidently Mr. Spraggins changed his mind.

83.     MDMR's Position Statement alleges that, "On or about March 19, 2024, Marine Patrol Assistant Chief Bryce Gex (Gex) spoke to Plaintiff having recognized that she was a new employee and wanted to ensure that she was well aware that she had full use of the handicap parking spaces at Bolton. Gex's comments were not a result of any request for an accommodations or inquiry. Gex spoke to the Capitol Police to inform them that Plaintiff may be utilize the handicap spaces conscience that Plaintiff was arriving before and leaving after the Capital Police shift of 8:00 a.m. to 5:00 p.m."

84.     Plaintiff concedes that on or around March 19, 2024, Assistant Chief Gex spoke to her.

85.    Plaintiff asserts, however, that this only substantiates it was visibly obvious to anyone observing that Plaintiff had a disability that impacted her mobility.

86.    Plaintiff does not dispute that there were handicapped parking spaces.

87.    As explained above, however, the handicapped parking spaces in the back of the building (i.e., the employee parking lot) were blocked off by a construction fence and not accessible.

88.    This was why she requested reasonable accommodation and was initially accommodated.

89.    The only other handicapped parking spaces were in the front of the building (i.e., the customer parking lot), which was much further walking distance to her office than the back of the building.

90.    MDMR's Position Statement alleges that, "Prior to Plaintiff employment and beginning around November of 2023, Marine Patrol management began a project to procure designated parking spaces for the dispatchers on the east side of the Bolton Building. This was to assist the dispatchers as a whole and was not specific to Plaintiff. DFA provided assistance for the 'dispatcher parking' spaces and signs were posted on or about March 18, 2024. The appropriate approvals for those designated parking spaces were not properly obtained and Marine Patrol management was instructed to remove the parking signs. The signs remained posted for about two days. The public and dispatch was still free to use the parking spaces but the signage was removed. The removal of the signs impacted all dispatchers as a group and was not specific to Plaintiff nor directed toward her in any way. It should be noted that the distance between the elevators in the center of Bolton and the handicap parking spaces on the north side of Bolton are

approximately the same distance to the aforementioned planned dispatcher spaces on the east side of the building."

91.    Plaintiff contends this allegation is false.

92.    The allegation about a project where signs were up for two days and then removed is false and fabricated.

93.    Plaintiff made a specific request for accommodation because the existing employee handicapped spaces were inaccessible.

94.    To address this, Plaintiff and Ms. Griffin specifically discussed a sign being placed, reserving a space for Plaintiff, near the Directors' parking area.

95.    Although the sign discussed by Plaintiff and Ms. Griffin was never put in place, Plaintiff parked in a space near the directors' spaces the very next day.

96.    Later that day, however, apparently Mr. Spraggins changed his mind, and Plaintiff was instructed to move her car.

97.    Plaintiff contends it made no sense and frankly seemed punitive to insist that she parked in the customer parking lot because of her disability.

98.    Her requested accommodation was, to put it bluntly, very reasonable.

99.    Yet even after she was initially accommodated, for reasons never explained, the accommodation was withdrawn.

100.    MDMR's Position Statement alleges that, "EMPLOYER disputes Plaintiff's allegation regarding her request for a parking accommodation. EMPLOYER asserts that no such request was ever made nor was 'a request for reconsideration' ever made. Again, at all times relevant, Plaintiff had access to all ADA complaint handicap parking spaces. Durning late July 2025, due to the ailments of a companion dispatcher, all of the

12

dispatchers were made aware that a schedule rotation would be made and thus placing Plaintiff on the night shift. This rotation applied to all dispatchers and not specific to Plaintiff. This move to the night shift was further discussed between Plaintiff her supervisor, Dispatch Team Lead Debbie Griffin (Griffin). Plaintiff initially provided positive feedback regarding the change. A couple of days later, Plaintiff expressed a concern to Griffin, that the night shift would complicate the care she was providing for her child and that she just simply wasn't going to work nights. Ms. /Simmons requested to remain on the day shift for an additional month (August), which Griffin accommodated her requested leaving her on the day shift throughout August of 2024."

101.    Plaintiff contends this allegation is false.

102.    As explained above, she made it clear she had a disability; since handicapped parking spaces were inaccessible in the employee parking lot, she requested reasonable accommodation.

103.    Initially she was accommodated and she parked in a parking spot near the Directors' parking spaces, close to the building.

104.    Then, for reasons unknown, that reasonable accommodation was withdrawn from her.

105.    In June 2024, Plaintiff requested that MDMR reconsider her requested accommodation.

106.    Soon after that, Plaintiff was told that she was being transferred to the night shift.

107.    The allegation that this rotation applied to all dispatchers and not specific to Plaintiff is false; Plaintiff was the one and only dispatcher moved to the night shift.

13

108. In fact, she was moved to the night shift, and Ms. Marroy was moved to the day shift, in defiance of the seniority preference rule previously explained by Ms. Griffin.

109. Interestingly, in this allegation it is claimed by MDMR that during late July 2025, due to the ailments of a companion dispatcher, all of the dispatchers were made aware that a schedule rotation would be made and thus placing Plaintiff on the night shift.

110. In the allegation below, the claim is made that newly hired dispatchers begin on day shifts and as their competence and confidence improves those dispatchers are then rotated onto a night shift.

111. Plaintiff contends this inconsistency in MDMR's narrative illustrates MDMR's unwillingness to simply admit its retaliatory animus.

112. At the time, Plaintiff heard nothing supportive of either of these allegations.

113. Rather, Ms. Griffin told Plaintiff that Ms. Marroy had connections in management and therefore Plaintiff' seniority over Ms. Marroy would be disregarded.

114. Plaintiff maintains that whatever other factors were involved, the main reason she was moved to night shift was retaliation after she dared to request that MDMR reconsider her request to be accommodated related to her disability.

115. Finally, Plaintiff contends that she was left with no choice but to be constructively discharged, not because she was forced to work on the night shift per se – although this was evidence of the retaliatory animus of MDMR, but primarily she was constructively discharged because MDMR refused to allow her a reasonable accommodation for her disability and refused to further engage in any interactive process; in short, MDMR failed to accommodate her.

116. MDMR's Position Statement alleges that, "Plaintiff alleges that she had

14

more seniority than another Dispatcher I and therefore should have retained her day shift. Plaintiff fails to explain that newly hired dispatchers begin on day shifts and as their competence and confidence improves those dispatchers are then rotated onto a night shift. Based on observation and the opinion of her supervisor, Plaintiff was ready to begin night shift rotations. It should be noted that Plaintiff had been on the job for approximately five (5) months and her performance was satisfactory to begin a night shift rotation. Plaintiff submitted her voluntary resignation on August 8, 2024, indicating she had full understanding that the position would lead to night shift duties."

117.   Plaintiff contends this allegation is false and misleading.

118.   It was not, as is here alleged, that a standard procedure for newly hired dispatchers was for them to begin on day shift and then, as their competence and confidence improved, to rotate them onto a night shift.

119.   Rather, Ms. Griffin explained to Plaintiff that shift choice for dispatchers was based on seniority and this consistently the case until Plaintiff requested that MDMR reconsider its previous denial of her request for accommodation.

120.   At that point, Ms. Griffin warned her that if she fought for her rights, MDMR leadership would "make your job harder".

121.   As it turned out, this is exactly what MDMR did.

122.   Plaintiff denies the allegation that she voluntarily resigned…indicating she had full understanding that the position would lead to night shift duties.

123.   Plaintiff contends she was constructively discharged when it became evident that MDMR was refusing to accommodate her request for reasonable accommodation and was retaliating against her for having made that request.

15

124.    On February 3, 2026, EEOC Local Office Director Erika LaCour wrote a letter of determination which stated the following:

"I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that the Charging Party was discriminated and retaliated against in violation of Title I of the Americans with Disabilities Act of 2008, in that the evidence submitted by the Charging Party is the best available evidence. Because of the Respondent's intent to defeat the statute by failing to fully respond to the EEOC's Request for Information, an adverse interference can be drawn. The Charging Party is entitled to the presumption that relevant data would have shown that the Respondent discriminated against the Charging Party because of her disability and retaliated against her because of her request for an accommodation which led to her constructive discharge."

## CAUSES OF ACTION

### COUNT I:  VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA) – DISABILITY DISCRIMINATION AND FAILURE TO MAKE REASONABLE ACCOMMODATIONS

125.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 124 above as if fully incorporated herein.

126.    Defendant failed to make reasonable accommodations for Plaintiff and her disability and discriminated against Plaintiff because of her disability based on the facts identified above which constitutes a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

127.    Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

128.    The unlawful actions of Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.  As such, Plaintiff is entitled to recover all available damages pursuant to the ADA pursuant to 42 U.S.C. § 1981a.

## COUNT II:  VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA) - RETALIATION

129.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 128 above as if fully incorporated herein.

130.    It is unlawful for any employer to discharge or discriminate against any individual for opposing any practice made unlawful by the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq*.

131.    As a result of Defendant's retaliatory acts described above, Plaintiff has suffered and continues to suffer significant lost pay and benefits as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

132.    Defendant engaged in the discriminatory and retaliatory acts described above with malice or reckless indifference to Plaintiff's federally protected rights.  As a result of this conduct, all available damages should be assessed against Defendant pursuant to 42 U.S.C. § 1981a.

133.    Plaintiff also seeks all other relief, at law or in equity, to which she may show herself justly entitled.

17

## COUNT III:  VIOLATION OF THE REHABILITATION ACT OF 1973 – DISABILITY DISCRIMINATION FAILURE TO MAKE RESONABLE ACCOMODATIONS

134.   Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 133 above as if fully incorporated herein.

135.   Defendant unlawfully discriminated against Plaintiff because of her recognized and acknowledged disability as defined by the Rehabilitation Act, 29 U.S.C. § 701 *et seq.,*  as amended.

136.   Defendant has failed to reasonably accommodate Plaintiff's disability based on the facts identified above which constitutes a violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, as amended.

137.   Defendant has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Plaintiff.

138.   By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, as amended.

139.   The unlawful actions of the Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.

## COUNT IV:  VIOLATION OF THE REHABILITATION ACT OF 1973 - RETALIATION

140.   Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 139 above as if fully incorporated herein.

141.   It is unlawful for any employer to discharge or discriminate against any individual for opposing any practice made unlawful by the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended.

142.   As a result of Defendant's retaliatory acts described above, Plaintiff has

suffered and continues to suffer significant lost pay and benefits as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

143.    Defendant engaged in the discriminatory and retaliatory acts described above with malice or reckless indifference to Plaintiff's federally protected rights.  As a result of this conduct, all available damages pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended, should be assessed against Defendant.

144.    Plaintiff also seeks all other relief, at law or in equity, to which she may show herself justly entitled.

### **PRAYER FOR RELIEF**

**WHEREFORE PREMISES CONSIDERED,** Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1.    Back wages;
2.    Reinstatement or future wages in lieu of reinstatement;
3.    Compensatory damages;
4.    Punitive damages;
5.    Attorney's fees;
6.    Lost benefits;
7.    Pre-judgment and post-judgment interest;
8.    Costs and expenses; and
9.    Such further relief as is deemed just and proper.

THIS the 16th day of May 2026.

Respectfully submitted,

Patricia Simmons, Plaintiff

By: /s/ Louis H. Watson, Jr.
Louis H. Watson, Jr.  (MB# 9053)
Katharine A. Vana (MB# 107123)
Attorneys for Plaintiff

OF COUNSEL:

THE WATSON LAW FIRM, PLLC
1501 JACKSON AVE W STE 113 PMB 101
OXFORD, MS 38655-2566
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: louis@thewatsonlawfirm.com
        kate@thewatsonlawfirm.com